Henry M. SUCKLE, M.D., Plaintiff,

v.

**MADISON GENERAL HOSPITAL,**
**Defendant.**

No. 70–C–124.

United States District Court,
W. D. Wisconsin.

Aug. 23, 1973.

John C. Wickhem, Wickhem, Consigny & Sedor, Janesville, Wis., and Albert E. Jenner, Jr., Jenner & Block, Chicago, Ill., for plaintiff.

Eugene O. Gehl, Axley, Brynelson, Herrick & Gehl, and Williard S. Stafford, Stafford, Rosenbaum, Rieser & Hansen, Madison, Wis., for defendant.

## OPINION and ORDER

JAMES E. DOYLE, District Judge.

This is an action under 42 U.S.C. §§ 1983 and 1985, and 28 U.S.C. § 1343(3). Jurisdiction is present.

The complaint alleges that the plaintiff, a physician and surgeon licensed to practice in Wisconsin, had been a member of the medical staff of the defendant hospital for a number of years when, on January 22, 1969, the defendant's board of directors decided not to renew his appointment to the staff. The complaint describes the procedures which preceded and underlay this decision.

The complaint alleges that the plaintiff was deprived of the procedural due process guaranteed him by the Fourteenth Amendment in these respects: he was not provided with a clear statement of the charges against him; he was not afforded a reasonable opportunity to be heard and to answer charges against him and to present his defenses; he was not afforded an opportunity to confront and to cross-examine his accusers; substantial and reliable evidence favorable to him was not considered; and he was not provided a hearing before an impartial judge of the facts.

The complaint also alleges that the defendant hospital conspired with Frederick R. Pitts, a physician and surgeon who was also a member of defendant's staff and who participated in the procedures leading to nonrenewal of plaintiff's staff membership, to deny to plaintiff the procedural due process guaranteed him by the Fourteenth Amendment in the respects summarized above and in this additional respect: that the medical cases on which plaintiff's competence would be tested were unfairly selected.

Injunctive relief is sought requiring defendant to restore plaintiff to membership on the medical staff of the hospital.

The action has been tried to the court on its merits. At the close of the plaintiff's case, defendant moved, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, for dismissal of the action. The court reserved a ruling on said motion. A pretrial order provided that the issue to be tried to the court is whether the plaintiff was denied that procedural due process guaranteed by the Fourteenth Amendment in the proceedings which culminated in the decision of the defendant's board of directors on January 22, 1969, not to renew his membership on the medical staff of the defendant hospital. If this issue is decided favorably to the defendant, the action is to be dismissed on its merits. If this issue is decided favorably to the plaintiff, a

declaratory judgment is to be entered to this effect; however, counsel are then to be heard on the question whether there should be further proceedings concerning further relief and, if so, on the question of what issues need be determined in such further proceedings.

Upon the basis of the entire record herein, I find as fact the matters stated in that portion of this opinion which appears immediately hereinafter under the heading "Facts."

## FACTS

At all times material to this case, plaintiff was a physician and surgeon duly licensed to practice medicine in the State of Wisconsin, limiting his practice to the field of neurological surgery. Over a period of more than 20 years prior to January 22, 1969, plaintiff had developed an extensive private practice in his specialty in the City of Madison, Wisconsin. In the course of these years, he had been a member of the medical staff of the defendant hospital for 20 years, and had also been a member of the medical staffs of St. Mary's Hospital and Methodist Hospital, all in Madison. He had served as chief of the medical staff of the defendant hospital for a period of three years ending December 31, 1967. Among these hospitals, it was the facilities of the defendant which plaintiff used principally in his practice, arranging for his patients to be cared for there and performing surgical procedures there. This opportunity to use the facilities of the defendant hospital arose from plaintiff's membership on its medical staff, and the opportunity was of major importance to the plaintiff professionally and thus financially.

Written by-laws, rules and regulations of the medical staff of the defendant hospital had been in effect for some years. A revision had occurred in 1966. Another revision was approved by the medical staff in November, 1968, but became effective in February, 1969, subsequent to the events which are critical to the present case. The February, 1969, revision is referred to in this portion of

this opinion only insofar as it is evidentiary of what measure of permanency of membership might reasonably have been expected by a staff member. Both the 1966 and 1969 versions provided that appointments to the staff were to be made by the board of directors of the hospital for a period of one year. The 1966 version provided that unless the medical staff recommended otherwise in a particular case, the board of directors of the hospital "may reappoint all members of the Medical Staff for a further period of one year." Both the 1966 and 1969 versions provided that in no case was the board of directors to refuse to renew an appointment without conferring with the medical staff or one of its committees; and that in a case in which a current staff member was not recommended for reappointment, the staff member was to be given notice and an opportunity to appear before certain combined committees. Under both revisions of the by-laws, rules and regulations, and under existing custom and usage as of January 22, 1969, a member of the medical staff of the hospital could realistically have expected that he or she would continue to be a member for an indefinite period of time in the absence of cause for nonrenewal, however cause might be defined, and in the absence of some procedural protections, whatever they might be.

On January 22, 1969, the board of directors of the defendant hospital decided not to renew plaintiff's membership on the medical staff. The effect of this decision was to deprive the plaintiff of the use of defendant's facilities in his medical practice. This deprivation substantially impaired his efforts to practice his profession and specialty. The decision by the defendant's board of directors, taken together with the events which preceded it and which are described hereinafter, substantially impaired the plaintiff's standing and associations in his community, and they reflected adversely upon his good name, reputation, honor and integrity.

The defendant hospital is a private, nonprofit organization organized under Wisconsin statutes. However, counsel for defendant have conceded in this case, and I find, that by virtue of its articles of incorporation, by-laws, customs and usages, contracts, and sources of funds, the defendant hospital was interrelated with the city government to such a degree that the disputed actions of the defendant, including those of its board of directors, medical staff, medical staff members and committees, and administrators, were actions performed under color of state law, within the meaning of 42 U.S.C. §§ 1983, 1985(3).

In early 1967, a committee of the medical staff of defendant was formed and called the utilization committee. As chief of staff, plaintiff was a member of the new committee. Because the hospital's facilities were then unequal to the demands upon them, the committee's principal function was to study the bases on which staff members were deciding that certain patients were to be admitted to the hospital and certain patients were not. A new admissions policy was formulated and adopted, effective April 1, 1967. The utilization committee thereafter developed procedures for checking on the performance of the staff members with respect to their exercise of their discretion in admitting patients. Numbers of charts of patients of various staff members were reviewed, including numbers of charts of patients of the plaintiff. At a meeting on September 26, 1967, which the plaintiff did not attend, the utilization committee decided that when a chart of a patient of one of the members of the committee was to be reviewed, the committee member would be expected to absent himself. At a meeting on October 31, 1967, at which plaintiff was present, he complied with a request that he depart. Thereupon, 22 of his patients' charts were discussed, and the committee agreed that 11 patients had been improperly admitted to the hospital. Those present then adopted a motion to the effect that the executive committee of the medical staff be

requested to create a special committee to investigate plaintiff's utilization of hospital beds, and the request was communicated.

On November 20, 1967, at a meeting at which the plaintiff presided, the executive and credentials committee of the staff agreed to create such a special committee, the membership of which was to be determined by the vice-chief of staff under certain guidelines. A few days later, the mission of the special committee was broadened to investigate all neurosurgical practice at the hospital. By about December 1, 1967, the special committee was appointed. Its chairman was Dr. Otto V. Hibma, then chief of surgery (and it will be referred to hereinafter as the Hibma committee). The members included a pathologist; four orthopedic surgeons; an ear, nose and throat specialist who had served on the utilization committee; an ophthamologist who had served on the utilization committee; and Dr. Frederick R. Pitts, the only neurosurgeon on the hospital staff other than the plaintiff.

The Hibma committee began its work promptly, looking into laminectomies, myelograms, and craniotomies performed by plaintiff during a six month period ending October 31, 1967, and into a few other earlier such procedures by him, as well as laminectomies performed by other staff members during said six month period. The inquiry came to focus increasingly upon the work of the plaintiff. Among the members of the Hibma committee, negative opinions about the plaintiff's professional performance began to crystallize.

The Hibma committee requested the assistance of the American Association of Neurological Surgeons, and the Association responded by designating Dr. Paul C. Bucy and Dr. Wallace B. Hamby to assist. Dr. Bucy and Dr. Hamby were neurosurgeons, neither of whom was acquainted with the plaintiff or with the defendant hospital. Dr. Hibma and Dr. Pitts prepared and submitted to Dr. Bucy and Dr. Hamby summaries of 96 of plaintiff's cases which had been reviewed by the Hibma committee. Also, Dr. Hibma furnished Dr. Bucy and Dr. Hamby with a preliminary draft of a report by the Hibma committee, which included a description of the procedures which the Hibma committee had followed, a statistical analysis of all neurosurgical diagnostic procedures and operations performed at defendant hospital during 10 months ending October 31, 1967, and a "general conclusion" that plaintiff had improperly utilized hospital beds, performed unnecessary surgery and diagnostic procedures, and kept records which were incomplete and often contained discrepancies. On July 30, 1968, Dr. Bucy wrote to Dr. Hibma to say that at the time of an anticipated August 6, 1968, visit to Madison by him and Dr. Hamby, they would particularly desire to have available the charts and materials on 21 cases, which he identified, from among the 96.

At this point, plaintiff had been provided no opportunity in any forum to respond to any criticism with respect to the 11 cases to which the utilization committee had reacted unfavorably, or to the reactions of members of the Hibma committee to any of the charts they had examined, including the 96 summarized by Dr. Hibma and Dr. Pitts for Dr. Bucy and Dr. Hamby, nor had he been notified of these criticisms by either of these committees.

On about July 31 or August 1, 1968, Dr. Hibma informed the plaintiff that on August 6, Dr. Bucy and Dr. Hamby would visit Madison to consult with the Hibma committee about plaintiff's performance at defendant hospital. Plaintiff requested an opportunity to meet with the visitors, but Dr. Hibma responded that he did not know whether this could be arranged. On August 2, 1968, Dr. Hibma furnished the plaintiff with a list of the names of the patients and the hospital record numbers in the 96 cases which had been summarized for Dr. Bucy and Dr. Hamby; the covering note stated that Dr. Hibma did not know which of these would come up for discussion August 6; the covering note

also contained a statement that the hospital records in these cases and the X-rays had been "put away" and that plaintiff would "have to review your office records on them." Between August 2 and August 6, plaintiff prepared a written statement for presentation to Dr. Bucy and Dr. Hamby; it consisted of various contentions about the motivations of Dr. Marlow, the chairman of the utilization committee, and Dr. Pitts; it included brief comments about a considerable number of patients whom plaintiff had treated over the years. In preparing this statement, he relied upon rumors he had heard about the nature of the developing criticisms of his professional performance within the utilization committee and the Hibma committee, and upon his own surmises about which particular patients' records had precipitated the criticisms. His impression of the nature of the criticisms was fairly accurate. When Dr. Bucy and Dr. Hamby visited Madison August 6, they spent the time from about 9:00 a. m. until mid-afternoon with the members of the Hibma committee. Dr. Bucy and Dr. Hamby took notes on eight points of criticism of plaintiff's performance mentioned by members of the Hibma committee, including: improper utilization of beds; unnecessary surgery; improper surgery; failure to send specimens to pathology; inadequate, incomplete, incorrect, and altered records. In the presence of the Hibma committee, Dr. Bucy and Dr. Hamby then examined and discussed about 20–25 specific charts, together with X-rays and pathological specimens. Plaintiff was then called to the hospital for a conference of about 45 minutes with the two visitors. He was proffered the opportunity to meet with Dr. Bucy and Dr. Hamby alone, or to meet with them and the members of the Hibma committee. Plaintiff elected to meet with Dr. Bucy and Dr. Hamby alone. Although plaintiff stated that he had brought his files with him on the 96 cases and was prepared to discuss any of them, Dr. Bucy and Dr. Hamby stated that this would not be necessary. There

was a discussion in the course of which plaintiff was invited to respond to the generalized criticisms which had been orally related to Dr. Bucy and Dr. Hamby that morning, rather than to comment on specific cases. He did so. The preliminary draft of the report of the Hibma committee was not shown or read to him at the time. When asked by the visiting surgeons to leave, plaintiff handed them the written statement which he had prepared. They read it later.

By letter dated September 25, 1968, a member of the board of directors of the American Association of Neurological Surgeons advised Dr. Hibma, cryptically, that the board of directors had approved the findings and recommendations of the Association's professional practice committee and the findings of its special consultants, Dr. Bucy and Dr. Hamby. The letter did not reveal the content of these findings and recommendations. Upon inquiry, the chairman of the professional practice committee informed Dr. Pitts, by another cryptic letter dated October 7, 1968, that "our committee reviewed in detail your committee's report [presumably the preliminary draft of the report of the Hibma committee in the form in which it had been sent to Dr. Bucy and Dr. Hamby, plus the oral criticisms of plaintiff's performance on which Dr. Bucy and Dr. Hamby had taken notes in Madison] and the report of our consultants [presumably Dr. Bucy and Dr. Hamby; the content or nature of their report had not yet been disclosed to anyone in Madison] and we were convinced that your investigation, as carried out by your committee, was impartial and thorough and that the findings of the committee were justified." (As described more fully below, it was not until December 23, 1968, that Dr. Bucy mailed to anyone at defendant hospital copies of two reports which he and Dr. Hamby had prepared in August on their inquiry.)

A final report by the Hibma committee was then completed and it was submitted to the executive and credentials

committee of the medical staff at a special meeting on November 12, 1968.

As of November 12, 1968, and through January 22, 1969, the executive and credentials committee consisted of 16 members, including plaintiff as immediate past chief of staff, and also including Dr. Hibma and Dr. Nordby, both of whom were members of the Hibma committee.

Plaintiff was given notice of the November 12, 1968, meeting of the executive and credentials committee, and he attended. Dr. Hibma read the report of his committee. It consisted of seven, single-spaced typewritten pages. It described the manner in which the committee had proceeded; it included some statistics about diagnostic procedures and operations; it stated five basic criticisms of plaintiff's performance, without reference to or identification of specific cases; it explained that Dr. Bucy and Dr. Hamby had inquired into the matter and it quoted the statement, quoted above in this opinion, in the letter of October 7, 1968, addressed to Dr. Pitts by the chairman of the professional practice committee of the American Association of Neurological Surgeons. The five basic criticisms included allegedly inadequate or inaccurate hospital records; alleged disregard of the findings and recommendations of consultants; alleged performance of major surgery without supportive diagnostic findings; operative findings of identification and treatment of pathology when the pathology was allegedly non-existent. Without identifying them by name or case number, the report referred to three cases as examples. No other specific cases were referred to by name, case number, or identifying data. Plaintiff had not been furnished with a copy of the Hibma committee report prior to the November 12 meeting of the executive and credentials committee, nor was he furnished with a copy at said meeting, nor was he furnished with a copy of the full report at anytime thereafter until the present lawsuit had been commenced. After Dr. Hibma had read the report of his committee, he suggested that the plaintiff depart before individual cases were discussed because his absence would permit freer discussion. The chairman of the meeting, Dr. James F. Land, who had become chief of staff, stated that plaintiff would be requested to depart, but that he would be permitted to make a statement at that stage of the meeting and that he would be given ample time thereafter to prepare and to present a defense to the charges against him. Plaintiff thereupon made an oral statement, responding generally to the report read by Dr. Hibma, during the course of which plaintiff asserted the unfairness of the procedures which had been followed to that point. Plaintiff departed. Members of the Hibma committee then presented discussions of eleven of plaintiff's cases; the presentation required about two hours. No decision was reached by the executive and credentials committee on further procedures concerning the plaintiff.

On November 18, 1968, the executive and credentials committee met again, without notice to the plaintiff, who was not present. Dr. Pitts and Dr. Vogt, members of the Hibma committee, were present. Dr. Pitts discussed five cases of plaintiff in which craniotomies had been performed; and Dr. Vogt, several in which lumbar laminectomies had been performed. The minutes of the secretary state, and I find: '"It was the feeling of the Executive and Credentials Committee that the findings of the investigating committee were substantiated and that all cases need not be reviewed now." It was decided to give the plaintiff the names of 3 or 4 patients in craniotomy cases of his, 3 or 4 in cervical laminectomy cases, and 3 or 4 in lumbar laminectomy cases, and to invite him to discuss them at a meeting of the executive and credentials committee. By this time, the executive and credentials committee had received the critical summaries of 96 of plaintiff's cases which had earlier been provided to Dr. Bucy and Dr. Hamby.

On November 22, 1968, Dr. Land, as chief of staff, wrote to plaintiff, enclosing a list of 12 cases, including four cases in each of the three categories referred to above, stating the name and hospital number of each, together with brief critical comments as to each of them. Dr. Land stated that rather than to have plaintiff respond to each chart which it had examined, the executive and credentials committee had decided that the 12 selected cases were a representative sample of the problems noted, and that an opportunity for the plaintiff to respond to this sample would be adequate. Plaintiff was invited to appear before the executive and credentials committee for this purpose on December 2, 1968. The 12 selected cases had not been among those which had been presented in detail to the executive and credentials committee, in plaintiff's absence, on November 12 and 18. The hospital charts and X-rays on the 12 cases were made available to the plaintiff. At the December 2, 1968, meeting, plaintiff made an oral response to the critical comments concerning each of the 12 cases. No committee action was taken.

On December 9, 1968, the executive and credentials committee met again, without notice to the plaintiff and without his presence. There was discussion concerning what action was appropriate to the case. A motion to approve the report of the Hibma committee was adopted. No further action was taken.

On December 12, 1968, plaintiff submitted a written statement concerning the 12 selected cases.

As noted above, by letter addressed to Dr. Hibma dated December 23, 1968, Dr. Bucy forwarded copies of two reports which he and Dr. Hamby had prepared concerning their inquiry into plaintiff's case; one was marked confidential, one was not. Both reports were received in evidence at the trial. The non-confidential report described the procedures which Dr. Bucy and Dr. Hamby had followed in the course of their investigation; discussed a number of specific cases without identification of name or hospital number but in sufficient detail to render some, if not all, of them identifiable; and set forth a number of serious criticisms of plaintiff's performance; this report had been prepared by Dr. Bucy and it bore his name and also Dr. Hamby's. The report marked "confidential" had been prepared by Dr. Hamby; it included nothing of substance about plaintiff's professional performance which did not also appear in the non-confidential report, but it revealed somewhat more of the investigators' reactions to what they had seen and heard.

A further meeting of the executive and credentials committee was held January 6, 1969. Plaintiff was invited to attend and did so. Dr. Hibma read the non-confidential report of Dr. Bucy and Dr. Hamby, in full. Copies of neither the non-confidential report nor the confidential report were provided to the committee members or the plaintiff. (No copy of either was provided to the plaintiff thereafter until this suit had been commenced.) Plaintiff was then invited to respond to the non-confidential report and did so. His response reveals that he was able to recognize several of the cases referred to, without specific identification, in the Bucy-Hamby report, but it does not reveal whether he was able to recognize all of them. Questions were put to him by committee members and he responded. Plaintiff departed, at the request of the committee. Three members of the committee then made statements concerning specific pieces of information adverse to plaintiff which they had obtained as a result of their own inquiries, and which were not specified in the Hibma committee report or in the Bucy-Hamby report. After discussion of various alternatives, with all 15 members present, the following resolution was adopted by voice vote, with one dissent:

"The Executive and Credentials Committee recommends that Dr. Suckle be asked to resign voluntarily from the Medical Staff of Madison General

Hospital and that any reapplication not be considered until after three years. The committee suggested that one of these years be spent in post-graduate neurosurgical training in an accredited program.

"If this recommendation is not accepted by Dr. Suckle, the Committee recommends to the Board of Directors at their January 22, 1969 meeting that Dr. Suckle not be re-appointed to the Medical Staff of Madison General Hospital."

There is no explicit evidence in the record whether the members based their decision exclusively on: (a) the 12 cases concerning which plaintiff responded on December 2, 1969; (b) the Hibma committee report; (c) the Bucy-Hamby report; or (d) the statement by the professional practice committee of the American Association of Neurological Surgeons; or some combination of these bases. However, the circumstantial evidence is strong, and I find, that the members based their decision on the aggregate of the information which they had received from all sources. (At a meeting of the executive and credentials committee on January 20, 1969, at which plaintiff was not present, a member, Dr. Nordby, who had also been a member of the Hibma committee, suggested that the January 6 resolution be reconsidered and modified. There was no supportive sentiment and no change was approved.)

On January 7, 1969, Dr. Land, as chief of staff, delivered a letter to the plaintiff and met with him personally. The letter stated that the executive and credentials committee had made a recommendation to the board of directors of the defendant hospital on January 6 and it then set forth the text of that resolution adopted by the committee on January 6 which is quoted in the immediately preceding paragraph of this opinion. The letter stated that the executive and credentials committee had come to the following conclusions:

1. You have abused the regulations in regard to bed utilization. In-spite [sic] of the fact that you were chief of staff when the rules and regulations regarding utilization were established, you flagrantly disregarded these rules.

2. Your records were found to be inadequate and/or incomplete in many instances. This included history and physical examination as well as progress notes. Most diagnostic study reports were stereotyped and failed to mention findings.

3. Most importantly, there were many cases in which diagnostic procedures were described but could not be substantiated as being done. There were many cases in which pathology was described as being present but could not be substantiated by x-rays or pathological findings.

4. Our judgements [sic] were similar to those reached by the two visiting neurosurgeons who stated that they "were most concerned, however, with Dr. Suckle's serious and obvious indifference to welfare and well being of the patients for whom he has been responsible.["] Without in any way excusing this serious lack of professional and ethical behavior, the most generous assumption which they could make is that Dr. Suckle is undertaking far more than he is able to do and thus has seriously neglected his responsibilities. He has failed to provide himself with the associates or assistants who might be able to repair some of the obvious deficiencies in his professional performance.

5. Your defense in most of the twelve cases was to charge others with wrongdoings. In many instances, your explanations were unclear, inadequate or incredible.

The letter made no reference to any further proceedings in the case, short of the alternatives of resignation or non-re-

newal referred to in the January 6 resolution.

However, orally on January 7, Dr. Land advised the plaintiff that he might contest the decision of the executive and credentials committee either by an appearance before a combined session of the executive and credentials committee of the medical staff and the joint conference committee of the defendant hospital, or before the entire medical staff of the hospital. The joint conference committee of the defendant hospital consisted of three members of the executive and credentials committee of the medical staff and three non-physician members of the board of directors of the defendant hospital.[1] The entire staff of the defendant hospital then consisted of 291 physicians, of whom 144 were members of the active medical staff.

During the entire period from the commencement of the work of the utilization committee through the action on January 22, 1969, by the board of directors, every effort was made by those conducting the inquiries into plaintiff's professional performance to prevent information about it from reaching others, including other staff members, not directly involved in the conduct of the investigation.

Between January 6 and January 22, 1969, there remained in effect the 1966 revision of the by-laws, rules, and regulations of the medical staff. The pertinent provision of those by-laws was Ar-

ticle III, Section 7, which was entitled "Appeals" and which read as follows:

Subsection 1. In any case where the Credentials Committee does not recommend for reappointment, or where the Executive Committee does not recommend reappointment, or where reduction of privileges is recommended, the Administrator shall notify the physician concerned and he shall be given an opportunity of appearing before the Credentials Committee and Joint Conference Committee in joint session.

Subsection 2. After a hearing as outlined above, the Joint Conference Committee shall make final recommendation to the Board of Directors.

The by-laws included no provision for an opportunity to appear before the entire medical staff, or before any forum other than "the Credentials Committee and Joint Conference Committee in joint session." The by-laws included no description of the nature of the contemplated appearance before the credentials committee and the joint conference committee.[2]

On September 6, 1966, the plaintiff, in his then capacity as chief of staff, had presided at a combined meeting of the credentials committee and the joint conference committee (and, apparently from the minutes, the executive committee), to consider a charge of unprofessional conduct filed by one member of the medical staff against another. The subject

---

1. The latter included a stockbroker, the dean of the University of Wisconsin school of pharmacy, and a banker. The former included Dr. Land, Dr. Nordby, and Dr. A. J. Richtsmeier, all of whom were members of the executive and credentials committee.

2. The by-laws assigned to the credentials committee and the executive committee of the medical staff the duty to "investigate" breaches of ethics by staff members. Article VII, Section 2. They also provided that deviations or infractions by staff members with respect to ethics or rules of conduct were to be referred to the executive and credentials committee for appro-

priate action. Article III, Section 2, Subsection 3. Under a revision of the by-laws which had been approved by the medical staff in November, 1968, but did not become effective until after January 22, 1969, there was also no provision for appeal to the entire medical staff; the revision provided that in connection with a hearing before the combined executive and credentials committee and joint conference committee, there was to be adequate notice of the hearing, adequate opportunity to defend against the charges at the hearing, right of representation, right to cross-examine witnesses, and right to present proof and argument.

matter was wholly unrelated to the plaintiff or to the subject matter of the present lawsuit, except as it reveals the procedure followed in another situation of which the plaintiff was aware. At that combined meeting, the complainant was heard first. The substance of the complaint was simple; it involved alleged interference with the care of a single patient by the complainant, and alleged disparagement of the complainant's medical competence in that particular case. The accused staff member was given the opportunity to respond orally, and did so; he responded to a few questions from the chairman. The complainant and the accused were excused. The members of the combined committees then engaged in a discussion of the particular incident, but also a wholly unrelated incident, and also matters relating to the accused's alleged drinking problem and alleged instability over 16 years. The credentials committee voted forthwith that the matter be referred to the executive committee for action. The executive committee voted forthwith to recommend termination (as contrasted with non-renewal) of the accused's staff membership. Some entity present, apparently the executive committee, voted forthwith that a special meeting of the active medical staff be held September 12, 1966, "to inform them of the action and ask for a vote of approval." All of these matters are set forth in the minutes of the meeting of September 6.[3] On September 12, 1966, a special meeting of the active medical staff was held; a quorum of 69 members was present at the opening of the meeting. A total of 80 names of members who were described as present appears at the top of the minutes. The minutes of the September 6 meeting were read, apparently including the minutes of the discussion which had taken place after the complainant and the accused had been excused. There was discussion and questioning in the course of which the complainant, the accused, and other members of the staff participated. The subjects of discussion included the matter to which the specific complaint related, and also the entirely unrelated incident which had been discussed at the September 6 committee meeting after the complainant and the accused had been excused, but they did not include (so far as the minutes reveal) discussion of the accused's alleged drinking problem or his alleged instability over a number of years. By a vote of 55 to 20, with one abstention, the medical staff supported the executive committee recommendation. The plaintiff, as then chief of staff, presided at the meeting.

By letter dated July 23, 1968, another member of the medical staff was advised that the executive and credentials committee had recommended disciplinary action against him. (This staff member was not the plaintiff, nor was he the staff member complained against in the proceeding described in the immediately preceding paragraph of this opinion. The subject matters of the complaint were wholly unrelated to the plaintiff or to the subject matter of the present lawsuit, except as the event reveals the procedure followed in another situation of which the plaintiff here might reasonably have been expected to be aware.) Without identification of specific cases, the letter stated that the reasons for the recommendation were: (1) excessive utilization of hospital beds for the patients of the accused; (2) failure of the accused to arrange for medical consultation despite the terms of a probationary order against him dated February 24, 1964; and (3) failure to keep proper hospital records on his patients. The letter advised him of his right to appeal to the board of directors of the hospital. Nevertheless, for reasons not explained in the record of this present lawsuit, he appeared, instead, with an attorney, at a combined meeting of the executive and credentials committee and the joint conference committee on August 7, 1968. He acknowledged that his record-keeping

---

3. The minutes reveal no participation by the joint conference committee, other than the presence of its members.

had been incomplete, but asserted that he had corrected this problem; he said he had no wish to be heard on this subject. There followed a discussion on points (1) and (2), above, in the course of which the cases of specific patients were discussed by the chairman and another member of the utilization committee, members of the combined committees conducting the hearings, and the accused. The minutes do not reveal the nature of the action taken.

With respect to the matters described in the two immediately preceding paragraphs of this opinion, involving disciplinary proceedings in 1966 and 1968 against two members of the medical staff other than the plaintiff, there is no evidence in this record whether or not any procedural protections were afforded the accuseds other than those summarized above. Because it is the defendant who relies upon the 1966 and 1968 proceedings in support of its defense, and because additional documentary and other information concerning those proceedings would have been within the defendant's power to produce at trial or in the course of pretrial discovery, I find that the accuseds in the 1966 and 1968 proceedings were accorded no procedural protection other than those described above in this opinion.

Between January 7 and January 14, 1969, plaintiff discussed his situation orally with Dr. Land, Dr. Nordby, and Gordon N. Johnsen, the administrator of the defendant hospital. Plaintiff requested a copy of the Hibma committee report and a copy of the report of Dr. Bucy and Dr. Hamby. The request was denied, except that on January 7 Dr. Land promised to send to the plaintiff, and on January 10 did send to the plaintiff, a copy of a portion of the report of the Hibma committee. Dr. Land's covering letter made clear that the enclosure was a "portion of the report." His description was accurate. The portion which was provided to the plaintiff included a description of the historical setting in which the Hibma committee was created; the general area of its inquiry;

the membership of the committee; the general manner in which it proceeded, including the fact that it had conducted an intensive review of laminectomies and craniotomies and that it had prepared a statistical review of neurosurgical diagnostic procedures and surgical procedures at the defendant hospital over a ten month period ending October 31, 1967; and the arrangements which had been made to obtain the assistance of Dr. Bucy and Dr. Hamby. The portion of the report which was provided to the plaintiff excluded the table setting forth the results of the statistical review for the ten month period; the conclusions of the Hibma committee, embodying its criticisms of the plaintiff's performance; and the concluding sentence of the full Hibma committee report in which was quoted the statement from the letter of October 7, 1968, to Dr. Pitts from the chairman of the professional practice committee of the American Association of Neurological Surgeons, to the effect that the latter committee considered justified the findings of the Hibma committee.

During the interval between January 6 and January 22, 1969, plaintiff made no inquiries of Dr. Land or other members of the medical staff or anyone else concerning the specific procedures which would be followed in connection with an appearance before a combined meeting of the executive and credentials committee and the joint conference committee, or an appearance before the entire medical staff. During that interval, neither Dr. Land, nor any other representative of the defendant hospital informed plaintiff of such specific procedures.

Several days after January 7, 1969, but not later than January 14, 1969, plaintiff informed Dr. Land that he did not desire to appear either before a combined meeting of the executive and credentials committee and the joint conference committee, or before the entire medical staff. On January 13, 1969, at a meeting of the joint conference committee, there was a thorough discussion of the recommendation by the executive

and credentials committee that plaintiff's staff membership not be renewed; no vote was taken at the meeting. The record does not permit a finding, and I make none, that this meeting preceded or followed the time at which plaintiff informed Dr. Land that plaintiff declined the opportunity to appear before a combined meeting of the executive and credentials committee and the joint conference committee, or to appear before the entire medical staff. However, there is no evidence that plaintiff was aware of the January 13 meeting at the time he declined both of the two proffered opportunities to appear, and I find that his declination was not based upon any knowledge on his part that the January 13 meeting had occurred. On January 14, 1969, Mr. Johnsen, the administrator, sent a letter to the plaintiff, reciting that plaintiff had declined both of the proffered opportunities to appear, and inquiring about plaintiff's choice as between resignation or action by the board of directors on the non-renewal recommendation.

On January 22, 1969, the board of directors of the defendant hospital met. The board of directors consisted largely of non-physicians, including, for example, the then mayor of the city of Madison, an alderman, a labor union official, a lawyer, a rabbi, a stockbroker, a banker, a housewife, and others. However, among the directors was the dean of the school of pharmacy of the University of Wisconsin and the chairman of the University's department of anatomy. As a member of the board of directors, plaintiff was present. Dr. Land stated that the executive and credentials committee had recommended that plaintiff's membership on the staff not be renewed. He read his letter to plaintiff, dated January 7, 1969. He described the history of the creation of the utilization committee and its work, the creation of the Hibma committee and its work, and the participation by Dr. Bucy and Dr. Hamby in the inquiry. He read the Hibma committee report and the Bucy-Hamby report. He stated that plaintiff had met with Dr. Bucy and Dr. Hamby. He stated that plaintiff had appeared before the executive and credentials committee. He moved that plaintiff's staff membership not be renewed, and the motion was seconded. On motion made, seconded, and carried, plaintiff was given an opportunity to speak in his defense, on the condition that he confine himself to the immediate problem at hand, in view of the exhaustive study made by the medical staff, as the movant put it. Plaintiff responded at considerable length, and in the course of his response, he made numerous references to what he considered the unfairness of the procedures which had been followed in his case up to that time, and numerous references to alleged failures and shortcomings of other medical staff members and hospital personnel. Plaintiff requested permission to submit to the board of directors a written statement which he had brought to the meeting, but permission was denied. Dr. Land and the plaintiff engaged in further discussion of the matter. No medical records or charts or x-rays were referred to, except that there was brought to the meeting room a specific hospital record in which it was alleged that an alteration had been made. There came a time at which Dr. Land and plaintiff advised the chairman, in response to his inquiry, that they had nothing further to say to the group. Dr. Land, Dr. Nordby, and the plaintiff left the meeting room and further discussion was had by the directors for about 15 minutes. Dr. Land, Dr. Nordby, and the plaintiff returned. The entire discussion had consumed about two and one-half hours. A vote was taken by secret ballot. It was announced that Dr. Land's motion had carried. The vote was 15 to 2. The president of the board was of the opinion, at the time he voted, that he and the other lay members of the board of directors could not judge medical records and charts, that they were required to depend upon the physicians to do that, and that it was the function of the board of directors to make sure that

the medical staff was doing a good job and not to substitute themselves (the directors) as experts in medicine. Based upon my own observations and experiences in the affairs of life, I find that the lay members of the board of directors generally shared the opinion of the president, described in the preceding sentence.

Also, based upon my own observations and experiences in the affairs of life, and based upon the testimony of an expert witness called by the plaintiff at trial and the documentary evidence received in the course of his testimony, and based upon the entire record herein, I find that as of 1967, 1968 and 1969, at the defendant hospital, it was reasonably possible and practical to devise and administer a procedure, with respect to a question of nonrenewal of medical staff membership, by which the effective decision was made by an appropriate instrumentality of the medical staff; and in which the physician in question received adequate notice of the specific charges against him and an adequate opportunity to respond to those charges; and in which a decision was based upon those charges to which he was given the opportunity to respond.

### OPINION

■ The actions of the members of the utilization committee, the Hibma committee, the executive and credentials committee, the board of directors of the hospital, the chief of the medical staff, and the hospital administrator were the actions of the state of Wisconsin, within the meaning of the due process clause of the Fourteenth Amendment. The injury with which plaintiff was threatened during these proceedings, and the injury ultimately visited upon him by the nonrenewal of his membership on the medical staff, was grievous. The non-renewal deprived him of his liberty and his property, within the meaning of the due process clause of the Fourteenth Amendment. Some minimal procedural protections were guaranteed him by the Fourteenth Amendment.

■ The members of the medical staff of a hospital are obviously the key to the quality of the hospital's performance. They are engaged in a joint enterprise. While the degree of their interdependence varies with the nature of their respective specialties and skills, there is a measure of interdependence which underlies their total relationship. Each has a stake in the level of performance of the others. Moreover, in general, members of the medical profession are the best qualified judges of the professional performance of other members of the medical profession. Accordingly, it is wholly understandable that when a question arises whether the membership of a medical staff member should be renewed, and when the question relates to the member's professional performance in relation to the hospital (as distinct, for example, from some alleged misconduct wholly unrelated to medical practice), those concerned might conclude that the medical staff should have a major voice, even a controlling voice, in the decision. It is clear from this record that in the defendant hospital in 1967, 1968, and 1969, although the ultimate power of decision was legally vested in the board of directors, the true decision-making function was lodged in the medical staff. Because this particular hospital was an instrument of state government, with respect to the Fourteenth Amendment, the threshold question arises whether lodging this true decision-making function in the so-called peer group was constitutionally permissible. I conclude that it was. Implicit in this conclusion is the proposition that the Fourteenth Amendment is not automatically offended despite the realistic possibility, even probability, that among the members of the medical staff there are some who harbor resentment or jealousy, and others who have formed personal evaluations in the course of experience over the years with the physician in question. Indeed, there may well be some members of the staff who have not been free of advance impressions, whether accurate or distorted, with re-

spect to the merits of the controversy, but in my view, this circumstance should not automatically bar them from participation in the decision-making process. I do not believe that the constitution requires the decision-making process to be as antiseptic in this context as it is required to be, for example, in a criminal prosecution.

■ Although plaintiff is persuaded that he was the victim of personal animosities and vendettas within the medical staff, the record in this lawsuit does not support such a finding. Of course, it is not for me to say whether the underlying charges concerning the plaintiff's professional performance were true or false, or whether the committees of the medical staff (or the board of directors of the hospital) drew the correct conclusions on that score, or whether the decision not to renew was an appropriate response to the conclusions they did draw. I can say, based upon the testimony and documentary exhibits, that generally the members of the committees of the medical staff appear to have engaged in a serious, conscientious effort to get at the facts, mindful of the importance of the matter to the plaintiff, the medical profession, the hospital, and the public.

Nevertheless, the fundamental question in this case is whether, whatever the motivations of the participants, the plaintiff's right to procedural due process under the Fourteenth Amendment was honored or denied.

The plaintiff's position on this fundamental question is set forth in his complaint and has been set forth earlier in this opinion. The defense rests, alternatively, on two principal contentions.

The first is that in the scheme of things within the defendant hospital between early 1967 and January 22, 1969, the work of the utilization committee, the Hibma committee, Dr. Bucy and Dr. Hamby, the professional practice committee of the American Association of Neurological Surgeons, the board of directors of that Association, and the ex-ecutive and credentials committee of the medical staff of the defendant hospital was entirely investigatory. The constitution did not require that the plaintiff be accorded procedural protections at any time during this extended investigatory period, and no conscious effort was made to accord him such protections. When the investigatory phase had been completed, the executive and credentials committee formulated its charges and communicated them to plaintiff. The plaintiff was then given a choice between two forums either of which would have been adjudicatory with respect to these stated charges. These two forums were either a combined meeting or meetings of the executive and credentials committee and the joint conference committee, or a meeting or meetings of the entire active medical staff. In either of these forums every constitutionally required procedural protection would have been provided. Plaintiff waived his right to be heard in both of these forums. The board of directors was free then to accept the non-renewal recommendation of the executive and credentials committee without affording plaintiff any procedural protections. I have found the issues raised by this first contention of the defendant extremely difficult.

The second principal contention of the defendants is that although not required to do so, and although not consciously intending to do so, the investigatory committees of the medical staff, the American Association of Neurological Surgeons, and the board of directors of defendant hospital did in fact accord to the plaintiff every procedural protection which was constitutionally required to precede a decision not to renew his staff membership.

I will consider the latter contention first. That is, I will ignore for the present the proffered opportunities to appear either before a combined meeting or meetings of the executive and credentials committee and the joint conference committee or before a meeting or meetings of the entire active medical staff.

I will consider whether plaintiff's constitutional right to procedural due process was honored in the course of the activities of the utilization committee, the Hibma committee, Dr. Bucy and Dr. Hamby, the professional practice committee of the American Association of Neurological Surgeons, the board of directors of that Association, the executive and credentials committee of the medical staff, and the board of directors of the defendant hospital. If so, there will be no need for further inquiry. If not, it will be necessary to explore the constitutional significance of the alternative opportunities proffered to the plaintiff on January 7, 1969.

*Was plaintiff provided the procedural due process required by the Fourteenth Amendment in the course of the activities of the utilization committee, the Hibma committee, the American Association of Neurological Surgeons, the executive and credentials committee, and the board of directors of defendant hospital?*

I once understood the Supreme Court to have said in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), that although procedural due process is a flexible concept and must be determined in each particular institutional and factual context, there are certain absolutely essential protections which must be afforded, regardless of the particular context, if the threatened loss of the individual is "grievous"; and that these absolutely essential protections are those enumerated in *Goldberg*. See Krause v. Schmidt, 341 F.Supp. 1001 (W.D.Wis.1972). Re-read even today, this is what *Goldberg* seems to say. However, without expressly repudiating this language, as far as I am aware, the Supreme Court has made clear by its actions in subsequent cases that even when the threatened or actual loss to the individual is clearly "grievous" by any reasonable standard, it does not follow that each of the minimal protections enumerated in *Goldberg* must always be provided. That is, the Supreme Court appears to have re-embraced, I think for-

tunately, the view that each particular institutional and factual context must be considered in determining whether any specific procedural protection, or any combination of specific procedural protections, is constitutionally required. See, for example, Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L. Ed.2d 484 (1972); Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).

■ In the particular institutional context of the present case, I have already concluded that it was constitutionally permissible to lodge the true decision-making function in the medical staff. However, within the medical staff, the procedures observed must be fundamentally fair. The criticisms which developed here related to the plaintiff's performance as a neurosurgeon in a number of cases involving specific patients. This number grew large, as the matter progressed. The subject matter was inherently sophisticated. Questions of professional judgment were involved. Moreover, the possible consequences to the plaintiff were obviously grave. Under these circumstances, the constitutionally required procedural protections would exceed those required, for example, in a situation in which the question was whether on a single occasion a particular staff member had spoken disparagingly of another staff member to the latter's patient.

■ I conclude that in this particular institutional context and in this particular factual context, the constitutionally minimal procedural protections to which plaintiff was entitled included:

(a) a detailed, written statement of the grounds upon which non-renewal of his staff membership was being considered, specifying the cases in which his professional performance was challenged, and stating in reasonable fullness the nature of the criticism in each case;

(b) written notice of the time and place of each occasion upon which

plaintiff would be afforded an opportunity to respond, said notice to be given at a reasonable interval prior to said occasion, such as a week to 10 days;

(c) access to all relevant hospital and medical records during the period provided for preparation of a response;[4]

(d) an opportunity to respond both in writing and orally;

(e) an opportunity to be heard by a decision-making entity, the members of which had not previously engaged in the investigative process and arrived at firm opinions; and

(f) a decision based entirely upon grounds and evidence previously disclosed to the plaintiff and to which he had had an opportunity to respond.

Neither as of October 31, 1967, when it decided to recommend to the executive committee that a special committee be created to investigate plaintiff's utilization of hospital beds, nor at any time thereafter, did the utilization committee afford the plaintiff any of these basic procedural protections. It did not inform him that it had decided that 11 of his patients had been improperly admitted, nor of the reasons for these decisions; it provided him with no opportunity to discuss or explain his reasons for arranging for the admissions.

From the time it was created on about December 1, 1967, until August 2, 1968, the resulting special committee (the Hibma committee) provided plaintiff with none of these basic procedural protections. From August 2, 1968, until November 12, 1968, when it submitted its report to the executive and credentials committee, the Hibma committee afforded the plaintiff the following procedural protections:

(a) On about August 2, the Hibma committee furnished the plaintiff with a list of the names of the patients and the hospital record numbers in the 96 cases which it had summarized for Dr. Bucy and Dr. Hamby. Plaintiff was advised that it was unknown which of the 96 cases would come up for discussion on the occasion of the anticipated visit by Dr. Bucy and Dr. Hamby on August 6. He was told that the hospital records of these cases would be unavailable to him.

(b) On the afternoon of the August 6, a few minutes prior to plaintiff's meeting with Dr. Bucy and Dr. Hamby, he was informed that they could see him and he was offered the option of meeting with Dr. Bucy and Dr. Hamby in the presence of the Hibma committee, or meeting with them alone. He chose the latter.

To furnish plaintiff with a list of 96 cases, to tell him that it was unknown which of them would come up for discussion August 6, to withhold from him the Hibma committee's criticism of his performance in the 96 cases, to deny him access to copies of the hospital records on the 96 cases, to give him a few minutes' notice of his opportunity to meet with Dr. Bucy and Dr. Hamby and of his option to meet with them in the presence of the Hibma committee, was neither to give him an adequate statement of the grounds upon which any possible sanction was being considered, nor to give him a minimally adequate opportunity to respond to any grounds which plaintiff might have guessed to be under consideration.

■ At no time on or before January 22, 1969, did the American Association of Neurological Surgeons afford the plaintiff any of the basic procedural

---

4. I am aware that representatives of the defendant were concerned for the integrity of the hospital records. Copies could have been prepared for plaintiff, while the originals were retained by defendant, if such a precaution was considered appropriate.

protections. Its board of directors and its professional practice committee provided him with no statement of the grounds upon which imposition of any sanction was being considered by the defendant hospital, nor with any opportunity to respond to these grounds, unless Dr. Bucy and Dr. Hamby are to be looked upon as agents of either the board of directors or the professional practice committee of the association. Dr. Bucy and Dr. Hamby afforded the plaintiff the following procedural protections:

> On August 6, they gave plaintiff a few minutes' notice that they were willing to meet with him. They then met with him for about 45 minutes. They informed him orally of several criticisms of his professional performance which had been expressed to them orally earlier in the day by members of the Hibma committee. This oral statement included no reference to any specific case. They listened to his oral statement in response to their oral statement of the Hibma committee criticisms. They declined his request to discuss with them any of the specific 96 cases identified in the list which had been provided to plaintiff by the Hibma committee on August 2. At the conclusion of the interview, they accepted a written statement which plaintiff had prepared in advance of the conference, and thereafter they read it.

To give plaintiff a few minutes' notice of his opportunity to meet with them, to provide him with an oral summary of generalized oral criticisms concerning his professional performance, to provide him with this oral summary only at the opening of the interview, to provide him with no statement of specific criticisms of his performance in any specific case, to decline his request to discuss any of the 96 specific cases, to accord him a total of about 45 minutes for the entire discussion, to accept and then to read a written statement prepared by plaintiff in advance of the interview when he had had the benefit of no statement of the grounds upon which the imposition of any sanction was being considered, and then to proceed to prepare written reports on the basis of information provided to them in writing and orally by the Hibma committee but not communicated to the plaintiff, was neither to give the plaintiff an adequate statement of the grounds upon which any possible sanction was being considered by the defendant hospital, nor to give him a minimally adequate opportunity to respond to any such ground, nor to base their conclusions on grounds which had been disclosed to him.

Beginning a few days prior to November 12, 1968, and continuing through January 6, 1969, the executive and credentials committee of the medical staff afforded the plaintiff the following procedural protections:

(a) It notified him that the committee was to meet on November 12.

(b) At the November 12 meeting, in plaintiff's presence Dr. Hibma read aloud the report of the Hibma committee. Plaintiff was permitted to respond orally to the Hibma committee report, and he did so.

(c) On about November 22, plaintiff was furnished with a list of twelve of his cases, together with brief critical comments about his performance in each case. The 12 cases had been selected by the executive and credentials committee, from among the 96, as being representative of the cases in which criticisms of plaintiff's performance had developed. The hospital charts and X-rays on each of the 12 cases were made available to plaintiff. Plaintiff was invited on about November 22 to appear before the executive and credentials committee on December 2 to make a statement concerning the 12 cases. He did appear on December 2 and made an oral statement. On December 12 he submitted to the committee

a written statement concerning the 12 cases.

(d) Shortly before January 6, plaintiff was invited to appear again before the executive and credentials committee on January 6, and he did so. On that occasion Dr. Hibma read aloud the non-confidential report of Dr. Bucy and Dr. Hamby. Plaintiff was invited to respond orally to the report, and he did so. Questions were put to him by the committee members, and he responded.

In determining the constitutional adequacy of the procedural protections provided by the executive and credentials committee through January 6, it is necessary to include those procedural protections afforded him earlier by the Hibma committee and by Dr. Bucy and Dr. Hamby; that is, there had been an accumulation of procedural events which bear on the situation as of January 6.

It is also necessary to examine the grounds upon which the committee's ultimate decision was actually based. Indeed, the latter is the heart of the matter. The executive and credentials committee did not itself identify the specific bases upon which its decision rested. I have been required to perform this identification process by examining the testimony and the documentary evidence in this lawsuit, and by drawing reasonable inferences from this evidence. I have found that the members of the executive and credentials committee based their January 6 decision on the aggregate of the information which they had received from all sources. In the paragraphs immediately following, I will undertake to summarize this information, and to indicate the extent to which plaintiff was made aware of it and was given the opportunity to respond to it.

(a) *The Hibma committee report.* This report was read aloud in the plaintiff's presence at the outset of the November 12 meeting, and he was provided the opportunity then and there to respond orally. Considering the nature of the subject matter and the gravity of the possible consequences to the plaintiff, the form of this notice of the grounds, and this opportunity to respond, were clearly inadequate.

■■■ (b) *The critical summaries of 96 of plaintiff's cases.* These summaries, which had been prepared by Dr. Hibma and Dr. Pitts, were furnished to the executive and credentials committee. Also, they were furnished to Dr. Bucy and Dr. Hamby, whose report in turn was furnished to the executive and credentials committee. Only the critical summaries of 12 of these 96 cases were furnished to the plaintiff. He was given no notice of the critical summaries of the balance of these 96 cases, and no opportunity to respond.[5]

(c) *The oral critiques on November 12 and November 18.* The significance of these presentations, which occurred in plaintiff's absence, is revealed by the notation in the minutes of the November 18 meeting that, following the critiques on that occasion, it was the "feeling" of the committee "that the findings of the investigating committee were substantiated and that all cases need not be reviewed now." Plaintiff was given no notice of the content of the oral critiques on November 12 and November 18, and no opportunity to respond. None of the 12 cases in which written criticisms were furnished him about November 22 was among those on which oral critiques were given the committee on November 12 and 18.

(d) *The reports by Dr. Bucy and Dr. Hamby.* The significance which the executive and credentials committee at-

---

5. One of the allegations of the complaint in this lawsuit is that the medical cases on which plaintiff's competence would be tested were unfairly selected. Presumably, the reference is to the 96 cases. I cannot agree that procedural due process requires that the cases be selected in any particular manner. A single case in which a physician performs badly may be a constitutionally adequate basis for non-renewal of staff membership.

tached to these reports is revealed by the fact that although the members had made up their minds by November 18, and had formally approved the Hibma committee report on December 9, they refrained from approving the recommendation of non-renewal until after the reports had been received. The non-confidential report of Dr. Bucy and Dr. Hamby was read aloud in the plaintiff's presence at the outset of the January 6 meeting, and he was provided the opportunity then and there to respond orally.[6] Considering the nature of the subject matter and the gravity of the possible consequences to the plaintiff, the form of this notice of the grounds and this opportunity to respond were clearly inadequate.

(e) *The information relayed to the committee by three of its members after plaintiff was excused from the January 6 meeting.* It is impossible to determine whether this information significantly affected the decision to recommend non-renewal. On the one hand, it appears that the members had made up their minds by November 18. On the other hand, the information was relayed just before the ultimate vote was taken. In any event, plaintiff was given no notice whatever that these matters would be considered, and no opportunity to respond.[7]

Defendant contends that with respect to the 12 selected cases, every required element of procedural due process was observed: the cases were adequately identified, as were the criticisms of plaintiff's performance; the information was provided about November 22, together with notice that plaintiff might respond at a December 2 meeting; plaintiff was given access to all hospital records on the 12 cases; and plaintiff did appear December 2 and did respond orally, and on December 12 he submitted a written statement. There are two major difficulties with this contention. First, there is nothing to support the proposition that the January 6 decision of the committee was based entirely on these 12 cases; the circumstantial evidence is so strong that I have been compelled to make a finding to the contrary. Second, on November 18, the "feeling" had crystallized among the members that the findings of the Hibma committee were substantiated and "that all cases need not be reviewed now." [8]

■ I conclude that all of the procedural protections afforded the plaintiff, cumulatively, through January 6, 1969, were constitutionally inadequate.

Plaintiff received no notice that his case would be discussed at a January 13, 1969, meeting of the joint conference committee; he did not attend the meeting; he was not notified even subsequently of what was discussed on that occasion.

Between January 6 and January 22, plaintiff was accorded no additional procedural protections, except that he was provided with an uninformative, carefully expurgated version of the Hibma committee report. During the course of the January 22 meeting of the board of directors, plaintiff was provided with no additional information about the grounds for the non-renewal recommendation.[9] Plaintiff was given the opportunity for an extended oral response to those matters which had been

---

6. I attach no constitutional significance to the failure even to read aloud to the plaintiff the "confidential" report of Dr. Hamby. It appears to contain nothing significant which does not also appear in the non-confidential report which was read.

7. In addition to items (a) through (e), above, Dr. Nordby and Dr. Hibma, as members of the executive and credentials committee, also had considered any additional information which had come to them earlier as members of the Hibma committee.

8. Dr. Hibma and Dr. Nordby, of course, had committed themselves to the findings of the Hibma committee no later than November 12.

9. Except for the production of a specific hospital record in which it was alleged that an alteration had been made.

revealed to him; his request to submit a written statement was denied. It is quite clear that the board of directors refrained, understandably, from making an independent judgment in the case. Neither the events between January 6 and 22, nor the events which occurred at the January 22 meeting of the board of directors, supplied any of the necessary procedural protections which had not been provided earlier.

*What is the constitutional significance of the proffered opportunities to appear either: (a) before a combined meeting or meetings of the executive and credentials committee and the joint conference committee; or (b) before the entire active medical staff?*

Let us assume, initially, a case in which a public hospital is considering non-renewal of the membership of a medical staff member, and in which at a certain point the hospital takes the initiative to provide the staff member with a detailed description of each specific element of an elaborate procedure which it intends to follow from first to last, if the member so desires. Assume that the member then elects to engage in the complete procedure as described, that he or she requests no additional or different procedures, that the complete procedure as described is carried out, and that the decision is not to renew the membership. Assume that the member then brings a lawsuit, contending that the procedure as described and carried out was constitutionally inadequate. If the court decides that the procedure as described and carried out was constitutionally adequate, obviously judicial relief will be denied. But if the court decides that the procedure as described and carried out omitted one and only one constitutionally required protection, the court must then consider whether the hospital's failure to provide it automatically entitles the staff mem-

ber to appropriate relief, or whether there was some duty on the part of the staff member to request the omitted essential procedural protection. As I have put the case, I would be inclined to the view that the failure of the staff member to request the omitted essential procedural protection might well bar him or her from obtaining judicial relief. However, if we assume the same case, except that the procedure as described and carried out contains only two elements and that the court later concludes that four omitted elements were constitutionally required, I would be less inclined to the view that the failure of the staff member to request any or all of the four omitted elements should bar him or her from obtaining judicial relief. The difficulty in distinguishing among a variety of such situations could be avoided, of course, by a rigid constitutional rule embodying one extreme or the other; that is, a constitutional rule placing upon the hospital the total burden of proffering and, if the proffer is accepted, providing every constitutionally required procedural element, or a constitutional rule excusing the hospital from providing any procedural protection whatever unless requested by the staff member to do so (I suppose even the latter rule would require that the staff member be made aware in some manner that non-renewal of his or her membership is under consideration).

■ Neither of these extreme constitutional rules commends itself to me.[10] I conclude that there must be an evaluation whether in the particular circumstances of each case a particular staff member is bound to request a particular procedural protection not proffered by the hospital. I intend to attempt such an evaluation in the present case. Before turning to such an evaluation of the facts of this particular case,

10. It is clear, however, that public hospitals would be well advised to adopt procedures consistent with an assumption that the institution should bear the complete burden of expressly proffering and, if the proffer is accepted, providing every constitutionally required procedural protection.

however, there is yet another major question to be answered.

Let us assume a case in which a public hospital is considering non-renewal of the membership of a medical staff member, and in which at a certain point the hospital takes the initiative to provide the staff member with a detailed description of each specific element of an elaborate procedure which it intends to follow from first to last, if the member so desires. Assume that simultaneously the hospital declares to the staff member that no additional or different procedures will be provided, whether or not requested. Assume that the staff member then declares his or her voluntary election to decline to engage in any of the described procedures; that no procedures are carried out; and that the decision is made not to renew the membership. Assume that the member then brings a lawsuit contending that the sanction was imposed without due process of law. It seems obvious that the member should not automatically receive judicial relief simply because no procedures were carried out. On the other hand, although it may be somewhat less clear, I believe that the member should not automatically be denied judicial relief because he or she elected to decline to engage in the described procedures. Rather, it appears that the court must determine the constitutional adequacy of the described procedures. If the court decides that they were constitutionally adequate, the judicial relief sought will be denied. But if the court decides that the procedures as described and limited by the hospital omitted even one constitutionally required protection, the judicial relief sought will be granted. The simplicity of this formula is deceptive, however. For example, if the described procedure provides that the hearing is to be conducted and the effective decision made by a single member of the staff who had conducted the investigation and who had signed the complaint, the court might find readily that the described procedure lacks the constitutionally essential element of a reasonably impartial decision-maker; however, if the described procedure provides that the hearing is to be conducted and the effective decision made by a committee, some of the members of which have had varying degrees of participation in the investigation and some have not, the court would encounter difficulty in finding whether the described procedure lacked the element of a reasonably impartial decision-maker. I have concluded that the court cannot escape the necessity of such fact-finding. Also, I have concluded that the decision cannot be based upon how the described procedures appeared to the staff member at the time he or she elected not to engage in them, even though the appearance may have been reasonable from the member's vantage point. So to base it would be unfair to the hospital if in fact the described procedures were constitutionally adequate. Also, so to base it would tip the scale in the direction of encouraging staff members to decline proffered procedures rather than to encourage them, as seems preferable, to engage in proffered procedures. Therefore, I conclude that the decision must rest upon the court's evaluation of the constitutional adequacy of the described procedures, based upon all of the facts as they are developed and found in the course of the lawsuit.

In the immediately foregoing discussion, I have assumed that the hospital takes the initiative to provide the staff member with a detailed description of each specific element of an elaborate procedure which it intends to follow from first to last, if the member so desires, and that the hospital declares that no additional or different procedures will be provided, and that, armed with this information, the staff member declines to engage in the proffered procedure. Obviously, the court's task in the ensuing constitutional litigation is far more difficult in a case such as the present case, in which the hospital's description of the proffered procedure is vague and lacking in detail, and in which the hospital volunteers no state-

ment whether it is open to requests for additional or different procedures. In such a case it is extraordinarily difficult to decide whether judicial relief should be denied the staff member because he failed to request that certain procedural protections be included in the vaguely described procedure, and equally difficult to decide whether judicial relief should be denied him because he elected not to engage in the vaguely defined procedure and thus to test what was in fact to be included within it.

Whatever the difficulties, I consider that I am required to make certain determinations from all the facts of this particular case, as I have found them.

First, I must determine what it was that Dr. Land proffered to the plaintiff between January 7 and about January 14. This must be determined not only by the words used, but also by the reasonable implications of those words in the light of the historical background and the surrounding circumstances.

Second, I must determine whether the procedures so proffered were constitutionally adequate.

Third, if the procedures so proffered were not constitutionally adequate, I must determine whether the plaintiff is to be barred from judicial relief because he failed to make inquiries about the details of the proffered procedures and failed to request that additional or different procedural protections be afforded him but rather simply declined to engage in the proffered procedures.

On January 7, Dr. Land proffered to plaintiff two alternative procedures.

█ Alternative (a) was an opportunity to appear before a combined meeting or meetings of the executive and credentials committee and the joint conference committee. It is unnecessary to attempt to ascertain what package of procedural steps may have been included by implication in this proffer. It is unnecessary because the forum was not reasonably impartial.

Those entitled to attend such combined meeting or meetings would have included the 15 members of the executive and credentials committee, which had already voted (fourteen to one) to recommend that plaintiff's staff membership not be renewed if he declined to resign, plus three members of the board of directors of the defendant hospital who were not members of the medical staff. The latter three included a stockbroker, a banker, and the dean of the school of pharmacy of the University of Wisconsin. Under one view, all 18 persons entitled to attend the combined meeting would have been entitled to vote on non-renewal. Under another view, only the six members of the joint conference committee would have been entitled to vote. Under the former view, which seems the more probable, 14 of the 18 persons voting would already have voted for non-renewal. Even under the latter view, at least two, and perhaps all three of the medical staff members (Dr. Land, Dr. Nordby, and Dr. Richtsmeier) of a six-member committee would already have voted for non-renewal; and to the opinions of these members of the medical staff the remaining three members could reasonably have been expected to defer in the absence of extraordinary circumstances.

The flaw in the composition of this forum represented a denial of the procedural due process guaranteed by the Fourteenth Amendment. Whatever the procedural embellishments which might have marked this alternative (a), they could not have saved it from unconstitutionality. Thus, it is clear that plaintiff's failure to request any such embellishments should not bar him from judicial relief.

But alternative (b) proffered by Dr. Land on January 7 is quite another matter. This alternative consisted of an opportunity to appear before a meeting or meetings of the entire active medical staff.

Plaintiff contends that this was also not a reasonably impartial decision-making forum, and that no procedural embellishments could have rescued it from its constitutional inadequacy. The

record in this case does not support this contention. The active medical staff consisted of 144 members. Of this number, approximately 30 had been members of either the utilization committee, the Hibma committee, or the executive and credentials committee, or of some combination of these committees, during the time that these committees were inquiring into plaintiff's professional performance. Of the 30, nine had been members of only the utilization committee. I cannot conclude from this record that those who had served on the utilization committee alone had arrived at firm opinions on anything more than that the plaintiff had improperly burdened the hospital facilities by arranging the admissions of eleven patients. I do conclude that the 21 persons who had served on the Hibma committee and on the executive and credentials committee (with one unidentified exception) had already arrived at firm opinions adverse to the plaintiff, relating to serious charges of professional misconduct in the cases of many patients. It is not an easy question whether the participation as voters by these 21 members, together with 123 other members, would have rendered the decision-making forum constitutionally inadequate. But even if we were to assume an affirmative answer to this question, it is a wholly unanswered question whether these 21 members would have participated as voters in the decision-making.

It appears probable that these 21 members would have participated in the discussion portion of the meeting or meetings of the entire active medical staff, whether or not they participated in the voting. Whether each of the 21 would have participated actively in the discussion is unknown. But it is reasonable to believe that the report of the Hibma committee and the recommendation of the executive and credentials committee would have been communicated to the meeting of the entire medical staff, and that the very presence of the members of these two committees at the meeting would have had an effect upon the other members of the active medical staff. I cannot conclude that this phenomenon—a measure of deference to the opinions of those who have engaged in investigative activity in the case—would render the proceedings unconstitutional. As I have observed earlier, I conclude that in this institutional context the decision-making need not be as antiseptic as it is required to be in a criminal prosecution.

Plaintiff contends that even though the forum of the entire active medical staff might be considered reasonably impartial, it is nevertheless inherently inadequate as an instrument of procedural due process because it is so large and unwieldy. I agree that it would have been difficult for so large a group to arrive at an informed, deliberate judgment concerning specific and detailed questions about the quality of the plaintiff's professional conduct in a large number of cases.[11] I cannot agree that the due process clause of the Fourteenth Amendment flatly prohibits the use of a forum consisting of many members. That the Constitution provides that the Senate is to sit in judgment in impeachment proceedings should be enough to dispel that notion. The critical question is not the size of the adjudicatory forum but the exact manner in which it performs its function.

11. Defendant apparently believes that in January 1969 plaintiff should have experienced a sense of confidence in a meeting of the entire active medical staff as an adjudicatory forum because he had presided, as then chief of staff, at such a meeting on September 12, 1966, at which an unrelated case of another member of the staff had been dealt with. I cannot say that the record of that September 12, 1966 meeting would inspire much confidence in the process. That the plaintiff presided over the 1966 meeting, and acquiesced in the procedures observed on that occasion, is irrelevant, of course, to whether the same procedures, had they been observed in his case in 1969, would have met the requirements of the Fourteenth Amendment.

I conclude, therefore, that the entire active medical staff was not a forum which was inherently unconstitutional, either by reason of any built-in bias or by reason of its size. Thus, I am forced to decide, in the context of the entire record in this case, what was fairly implied by Dr. Land's January 7 proffer of an opportunity to appear in that forum, with respect to the procedural protections which would be afforded in the course of preparations for that appearance, during the course of that appearance, and at the decision-making stage.

As of January 7, plaintiff had not received a detailed, written statement of the grounds upon which non-renewal of plaintiff's staff membership was being considered, specifying the cases in which his professional performance was challenged, and stating in reasonable fullness the nature of the criticism in each case. Despite defendant's assertions of its adequacy, Dr. Land's letter of January 7 was not such a statement. When, as of January 7, plaintiff requested copies of the Hibma committee report and of the reports of Dr. Bucy and Dr. Hamby, his request was denied by Dr. Land, except that on January 10 plaintiff was furnished with an insipid and extremely carefully expurgated version of the Hibma report. This incident indicates that, at least in the absence of a demand by the plaintiff, the chief of the medical staff would persist in the strange notion that a full statement of the specific charges against him should continue to be withheld from the plaintiff. I conclude from this record that the January 7 proffer of the opportunity to appear before the entire active medical staff did not include by implication a proffer that the constitutionally required specific written statement of charges would be provided prior to the appearance before the staff.

I conclude that the January 7 proffer of the opportunity to appear before the entire active medical staff included by implication that plaintiff would be given notice of the specific time and place early enough to permit him to prepare.

This conclusion is supported by the fact that Dr. Land had given plaintiff notice on November 22 of the executive and credentials committee meeting on December 2.

I conclude that the January 7 proffer of the opportunity to appear before the entire active medical staff included by implication that plaintiff would be granted access to all relevant hospital and medical records during the period provided for preparation of a response. This conclusion is supported by the fact that access to the records of 12 cases was granted to plaintiff in advance of the December 2 meeting of the executive and credentials committee.

I conclude that the January 7 proffer of an opportunity to appear before the entire active medical staff included by implication that the plaintiff would be permitted to make both an oral and a written presentation. Clearly, it included an oral presentation. With one exception, nothing in the record suggests that a written presentation would not have been permitted. The exception is the January 22 action of the board of directors in declining to accept a written statement from the plaintiff. However, it was not understood in advance of the January 22 directors' meeting that the board was to conduct a hearing in plaintiff's case; the hearing was improvised as a result of plaintiff's request made at the time of the meeting. Also, the lay members of the board of directors were obviously disposed simply to accede to the reports and recommendations of the committees of the medical staff without exercising an independent judgment. Under the procedure proffered on January 7, it was clearly implied that the entire active medical staff would be advised in advance of the purpose of the meeting or meetings, and the members of the active medical staff would have been competent to exercise an independent judgment. The board of directors' declination to receive a written statement from the plaintiff is not indicative that the active

medical staff would also have declined to receive one.

I conclude that the January 7 proffer of an opportunity to appear before the entire active medical staff did not include by implication that the decision by the staff would be based entirely upon grounds and evidence previously disclosed to the plaintiff and to which plaintiff had enjoyed an opportunity to respond. This question is intimately linked to the question whether the January 7 proffer included by implication that sufficiently in advance of the meeting of the active medical staff, plaintiff would be provided with a detailed, written statement of the grounds upon which non-renewal of his staff membership was being considered, specifying the cases in which his professional performance was challenged, and stating in reasonable fullness the nature of the criticism in each case. If such a constitutionally sufficient written statement of charges were to have been furnished, then it is probable, although not certain, that the eventual decision by the active medical staff would have been based upon these charges and upon the evidence presented in support of them and in opposition to them. But I have concluded earlier that the January 7 proffer did not include by implication that such a constitutionally sufficient written statement of charges was to have been furnished.

In summary, I have determined that what was proffered on January 7 included the following: (1) an opportunity to be heard by a forum (the entire active medical staff) which was not inherently unconstitutional, either by reason of built-in partiality or by reason of its size; (2) no more specific statement of charges than the constitutionally inadequate statements already communicated to plaintiff as of January 7; (3) an adequate time between notice of the meet-ing of the active medical staff and the meeting itself; (4) access to hospital and medical records during the period of preparation for the meeting; (5) opportunity for both an oral and a written presentation; and (6) an ultimate decision by the active medical staff which might or might not have been based entirely upon grounds and evidence previously disclosed to the plaintiff and to which he had enjoyed an opportunity to respond.[12]

I determine that the procedure thus proffered to plaintiff on January 7 failed to meet the minimal requirements of procedural due process under the Fourteenth Amendment.

Thus, I must determine, finally, whether in the circumstances of this case plaintiff is to be barred from judicial relief because he failed to make inquiries about the details of the procedure proffered on January 7 and failed to request that additional or different procedural protections be afforded him.

From all that has been said, it stands forth starkly that the constitutional key to all else, as of January 7, was whether, prior to a meeting or meetings with the active medical staff, plaintiff was to be furnished with a detailed, written statement of the grounds upon which non-renewal of his staff membership was being considered, specifying the cases in which his professional performance was challenged, and stating in reasonable fullness the nature of the criticism in each case. One cannot exclude the possibility that even had such a statement been furnished, some constitutional aberration might have occurred in the ensuing proceedings. But the probability is that, constitutionally speaking, the ensuing proceedings would have been adequate. That is, the furnishing of such a statement would have set in motion a chain of events which would have ren-

12. In the course of determining what was included in the January 7 proffer, expressly or by implication, I have given no consideration to the testimony of Dr. Land and Dr. Nordby at trial as to what they thought would have occurred procedurally. With no disrespect to these witnesss, I have concluded that such testimony is so inescapably self-serving that I should base no findings upon it.

**1222**

dered it a virtual necessity that the proceedings be fundamentally fair.

If one assumes that such a statement would have embodied the critical summaries of the 96 cases, the representatives of the active medical staff could scarcely have refused to provide plaintiff with adequate time to prepare, with access to the relevant hospital records, and with the opportunity to respond both in writing and orally. The bases for the report of the Hibma committee and for the recommendation of the executive and credentials committee would have been laid bare to their medical colleagues on the entire active staff. The members of the active medical staff could scarcely have failed then to appreciate the difficulties involved in forming an independent judgment on these 96 cases, and an appreciation of these difficulties would have compelled that appropriate arrangements be made (such as dividing the staff into three segments and providing a separate presentation to these smaller groups on two occasions each, followed by a single meeting of the entire staff) to insure that an informed, deliberate judgment could be arrived at by the entire medical staff. In such a situation, the respect to be accorded by the entire staff to the report of the Hibma committee and the recommendation of the executive and credentials committee would have been diminished to an appropriate level. Had the members of those committees participated in the discussions, and perhaps even voted, their influence would have been diminished to a more appropriate level. Finally, it would have been unmistakably clear to the members of the medical staff that their obligation was to reach a judgment on the basis of the 96 cases and not upon some other, undisclosed basis.

If one assumes, on the other hand, that the detailed statement of charges had been confined to perhaps 12 specific cases, either those previously disclosed to the plaintiff or another set, much the same constitutionally healthy consequences would have resulted, but with some differences. The plaintiff would have been in a strong position to persuade the active medical staff that it was being called upon to judge his professional performance on the basis of the 12 selected cases, and on no other basis. It would have followed that the medical staff would have been foreclosed from giving any weight to the report of the Hibma committee or to the recommendation of the executive and credentials committee, because that report and that recommendation rested upon undisclosed bases other than the 12 cases.

A simple inquiry by the plaintiff, preferably in writing, whether the proffered proceedings before the active medical staff were to be based upon such a specific, detailed set of charges related to particular cases, or a simple demand or request by him that they be so based, would have been sufficient. Had the inquiry been answered negatively or had the demand or request been denied, the plaintiff could safely have declined to engage in the proffered procedure. But had the representative or representatives of the medical staff responded affirmatively, the plaintiff probably would have received constitutionally adequate treatment by the staff.

I conclude that plaintiff's failure to make such an inquiry, demand, or request, in the circumstances of this case does bar him from judicial relief. I am keenly aware that the procedures followed generally through January 6 provided no basis for any confidence that the response to his inquiry, demand, or request would have been affirmative. On the other hand, with respect to the procedure from November 22 through December 2, there had been an indication that Dr. Land and his colleagues on the executive and credentials committee at least dimly perceived the significance of an opportunity to respond to specific charges. From October 31, 1967, to January 7, 1969, the significance of such an opportunity had become painfully clear to plaintiff. Under such circumstances, I conclude that his decision simply to bypass the meeting of the entire medical staff, without any effort to clar-

ify the procedures which would be observed prior to the meeting and at the meeting, bars him from obtaining relief in this court on the basis of his contention that he was denied the procedural due process guaranteed him by the Fourteenth Amendment.

### ORDER

It is ordered that the defendant's motion, made at the close of the plaintiff's case, for dismissal of this action is hereby denied.

It is ordered, upon the basis of the entire record herein, that this action is hereby dismissed on its merits.